No. 27,282.

M. W. ALLEN, H. H. TROXALL, L. A. LADD and R. E. SMITH, *Appellees*, v. THE GREENLAND OIL COMPANY, O. G. BITLER, DEANE GILL et al., *Appellants*.

### SYLLABUS BY THE COURT.

AGENCY — *Ratification or Repudiation of Unauthorized Act — Unauthorized Agreement Between Agents to Purchase Oil Lease on Principals' Joint Account.* Plaintiffs, defendant and divers other parties sought to abtain an oil and gas lease for their respective interests. Plaintiffs' agent proposed to defendant's agent that they should endeavor to buy for their principals on joint account. About the same time the principals themselves agreed to instruct their agents to bid up to $40,000 for the lease on their joint account. Ere these instructions were received, other competitors for the lease had raised the bidding beyond $40,000. Plaintiffs' agent had discretionary powers to make any sort of contract to obtain a lease or an interest in it. Defendant's agent had no authority to bid or buy except pursuant to instructions; and he was eventually authorized to bid up to $50,000 for his principal, but not on joint account. Plaintiffs' agent knew the limitations of authority vested in defendant's agent, but the agents did agree to bid and buy together at whatever price was necessary and regardless of a want of such authority in defendant's agent. Later and before the lease was sold at auction, the agent for a third competitor appeared, and defendant gave its agent permission to bid and buy in connection with the agent of such third competitor, and then defendant's agent agreed with plaintiffs' agent that plaintiffs should have a quarter interest in the lease. In consideration of this promised quarter interest in the lease, if defendant's agent was the successful bidder, plaintiffs' agent refrained from attending the auction and bidding for the lease. The lease was auctioned off on a bid of $55,000 by defendant's agent, and a lease

Agency, 2 C. J. pp. 468 n. 52, 469 n. 67, 484 n. 53 new, 569 n. 22.

Allen v. Greenland Oil Co.

in behalf of defendant and the third competitor was executed pursuant thereto. Defendant promptly ratified the act of its agent in bidding in excess of his authority; and promptly disavowed its agent's agreement to give plaintiffs a quarter interest in the lease, and declined to be bound thereby. *Held,* that the ratification of the agent's bid and purchase of the lease from the lessor at a price in excess of his authority did not carry with it a ratification of the agent's agreement that plaintiffs should have a quarter interest in the lease.

Appeal from Greenwood district court; Allison T. Ayres, judge. Opinion filed April 9, 1927. Reversed.

*James F. Getty,* of Kansas City, and *Homer V. Gooing,* of Eureka, for the appellants.

*Gordon A. Badger, S. F. Wicker,* both of Eureka, *G. H. Lamb* and *W. E. Hogueland,* both of Yates Center, for the appellees.

The opinion of the court was delivered by

Dawson, J.: This was an action to secure an adjudication of plaintiffs' claim of right to an undivided one-fourth interest in an oil and gas lease on one hundred and sixty acres of land in Greenwood county and for other equitable relief.

The land in question, S. W. ¼, 25-23-8, belongs to Rachel M. Craft and her brother and mother, all of whom are residents of Washington, Pa. In the summer of 1925, an oil boom was in progress in Greenwood county in the vicinity of Mrs. Craft's land; an oil well which promised large production was nearing completion; and a lease of Mrs. Craft's property was much desired by plaintiffs, defendants, and others.

Plaintiffs in this action are four Greenwood county men, Allen, Troxall, Ladd, and Raymond E. Smith. Defendants are the Greenland Oil Company, a corporation, Bitler its president, and Deane Gill, its treasurer, assistant secretary and office manager.

Early in June, 1925, plaintiffs authorized one of their number, Smith, to go to Pennsylvania and endeavor to obtain a lease of Mrs. Craft's land or an interest in it. He called on Mrs. Craft at her home. She told him she expected Deane Gill and would not set a price on the lease until he arrived. A day or so later, Gill appeared and called on Mrs. Craft. He and Smith also called together. Mrs. Craft was then receiving rising bids from various parties, and decided to have her lawyer sell the lease at auction in his office. Smith proposed to Gill that he and Gill should buy the lease together. Gill

said he could not do that because the company he represented had two partners, Hays and Robinson, and that his authority to bid on the lease was limited; but he added that he had not come to Pennsylvania "to be made a monkey of," and indicated an intention not to be bound by his instructions. About that time Gill was advised that his corporation's partners, Hays and Robinson, had decided the bidding would be too high to suit them and that they need not be considered. Gill wired Bitler to ask Ladd, one of these plaintiffs and Bitler's uncle, to call Smith home, but nothing came of that request. About the time that telegram was received, these rival groups of litigants were in conference in Eureka arranging to buy the lease together and avoid competition; and they did agree to have their respective agents in Pennsylvania, Smith and Gill, make a joint bid up to $40,000 for the lease. Bitler for the oil company wired Gill to that effect, and Troxall similarly notified Smith. Troxall's telegram to Smith read:

"EXHIBIT I.

"4 p. m. 6-9, 1925.

"*Raymond Smith, George Washington Hotel, Washington, Pa.:*

"Make lease to yourself and Gill up to forty thousand.          TROXALL."

The substance of this $40,000 agreement and Bitler's instructions to Gill concerning it were testified to by Troxall, one of the plaintiffs:

"Mr. Bitler said, 'We will go ahead and instruct Gill to go to forty thousand dollars.' He said, 'We have a call in for him now. We will instruct him to go to forty thousand. You also instruct Smith to go in with Gill and buy the lease up to forty thousand.'

"Just a few minutes after that, they got a call through to Mr. Gill. Mr. Bitler talked to Mr. Gill there in my presence and I heard his end of the conversation. He told Mr. Gill that we were in his office at that time, and that Robertson and Hayes were out of it, that it had got too high for them and they had dropped out, and for him and Raymond to get together and buy the lease together. . . .

"THE COURT: Q. Did you testify as to the notice to be sent to Gill? A. Yes, sir; Mr. Bitler talked to Mr. Gill, and instructed him to go in with Mr. Smith, and to buy the lease for forty thousand dollars. He said, 'We have agreed down here among ourselves to go to that, to buy it for forty thousand dollars together.'

"Q. At whose request was this telegram, exhibit 1, sent? A. Well, Mr. Bitler had talked to Mr. Gill, and he requested that we send Mr. Smith the same instructions."

These negotiations were without result, however, for the bidding in Pennsylvania had already gone beyond $40,000, which was the

Allen v. Greenland Oil Co.

sum the agents were authorized to bid on plaintiffs' and defendants' joint account; and indeed the record shows virtually beyond dispute that certain members of both groups of principals knew that fact before the $40,000 agreement was made. Very shortly afterwards Bitler instructed Gill to bid up to $50,000, and Troxall had already instructed Smith to go to $50,000 before the $40,000 agreement was made. On cross-examination Troxall admitted:

"I had learned that the lease was going to be that high in the morning when Mr. Smith called me up. He said, 'I believe it will be fifty thousand dollars.' . . .

"Q. Now, then, Mr. Troxall, did you, at that interview you had in the bank, or at Bitler's office, did you or Allen or Ladd tell Mr. Bitler that you had given Smith the privilege of going to $50,000, if he wanted to?" [No answer.]

"Q. Did you tell Mr. Bitler that you had given Smith authority to go to any amount that he wanted to go to, to buy that lease? A. There wasn't a word said in regard to that.

"We never informed Bitler of that, that I know of, I didn't. In compliance with our agreement down there with Mr. Bitler we were to send a telegram to Smith and we wired Smith to make the lease to ourselves and Gill, up to $40,000. We did not say he could not go any higher for us. That was as high as he could go for them. . . .

"The last time I heard from the Greenland Oil Company they said that $40,000 was as high as they were going. We were willing to go higher. . . .

"Q. Did you understand that the Greenland Oil Company was in on their account, the same way? . . . A. I don't know anything about that.

"That was the end of that proposition and interview.

"Q. Now, then, Mr. Troxall, did you leave the table right then and there, after that interview, and after that telephone message to Mr. Gill by Mr. Bitler, did you leave the table and go to the telephone office and telephone your man Smith to bid $50,000 for that lease?" [No answer.]

"Q. Do you say that you did not telephone that—after that meeting— to Smith, to bid $50,000? A. I phoned him in the morning.

"Q. After that first interview, when Mr. Bitler telephoned to Gill the forty thousand dollar limit, didn't you say, or didn't you go to the telephone and telephone Smith to make it fifty thousand? A. I phoned him that in the morning. . . .

"Q. Now, then, Mr. Troxall, isn't it a fact that Smith had telephoned you before you had this interview with Mr. Bitler and the Greenland Oil Company people, at their office, that Smith had telephoned you that it would take fifty thousand dollars to get this lease? And when I say you, I mean you and your associates, Mr. Allen and Mr. Ladd? A. Yes, sir.

"Q. So that you knew, when you were making this contract up here with Mr. Bitler and the Greenland Oil Company people, when Mr. Bitler set the forty thousand dollar limit, isn't it a fact that you already had a deal to buy

that lease for fifty thousand dollars, if you could? Isn't that true? A. At that time——

"Q. No, answer my question, yes or no. Isn't that true?

"To which the plaintiffs object as not being proper cross-examination.

"Sustained. [Erroneous ruling?]

"Q. At the time that you and Mr. Bitler and these Greenland Oil Company people were arranging a limit of $40,000, for the joint purchase of this Craft lease, you had already learned from your man Smith that it would take fifty thousand dollars to buy that lease, had you not? A. That was in the morning.

"Q. And you had already phoned to Smith to go to fifty thousand dollars?" [No answer.]

Recurring to the doings of the agents themselves, according to Smith's testimony, Gill eventually gave his assent to Smith's proposal that they bid together for the lease. Smith testified:

"A. Mr. Gill said, I have just talked with Mr. Bitler, and he says that the lease has got too high for Hays & Robinson, and that they are out of it. He said, we will go together to buy the lease. I said, that is fine."

Shortly thereafter, H. J. Sherman, agent of the Phillips Petroleum Company, arrived in Washington, Pa., to take a hand in the bidding. He was known to Gill, and according to Smith's testimony, Gill said:

"I believe this will simplify matters. I think I can get Sherman to take a half interest in this lease, and then we will divide the other half. . . . But you leave Sherman to me, let me handle Sherman. . . .

"They [Gill and Sherman] went up to the room, and he came back in a little while, and he said, I believe it will be all right. He said, Sherman is favorable, and he has got a call in for the Phillips Petroleum Company now, and he will know in a little while. . . .

"In a little while he said it was fine and dandy, that they were satisfied with a half interest, and he said, you leave Sherman to me; we will divide the other half interest. . . .

"A. I told Mr. Gill that as long as he wanted to handle Mr. Sherman in the deal, there was no need of my staying there any longer, if he would go ahead and buy a one-fourth interest for me. He. said he would do that for me. I said, well, I might just as well catch the interurban and go to Pittsburgh. I said, this lease will bring over fifty thousand dollars, but I said I don't believe it will bring much more. He said it had gone about to his limit. I said, I will stay in there just as long as Phillips sees fit to bid on the lease. I said, it will be all right for you to buy my quarter interest. He said, I want to depend on that. If the Greenland Oil Company won't take a quarter interest, I will take a quarter interest personally, but I don't want a half interest personally.

"Then I started to walk away and he said, 'Don't you want me to wire

you if I get it?' I said, 'I sure do, I didn't think of that.' . . . I then checked out and caught the interurban for Pittsburgh, and came on home."

While in Washington, Smith had suggested that Mrs. Craft's royalty would be a good investment, but Gill said it would be unwise 'to get her interested in that matter until the leasing of the property was settled.

On June 11, 1925, the day after Smith left for home, the lease was sold at auction in the office of Mrs. Craft's lawyer for $55,000 on the bid of Deane Gill, and at his instance the lease was executed to the Greenland Oil Company and the Phillips Petroleum Company. The same day Gill wired Bitler:

"6-11-25.

*"O. G. Bitler, 920 Land Bank Building, Kansas City, Mo.:*

"Starting five-year commercial lease through banking channels to-morrow morning with ten-day drafts attached subject to approval of title via First National Bank, Bartlesville. Phillips draft twenty-seven thousand five hundred dollars, ours same drawn on Commercial National Bank. I exceeded your limit by twenty-five hundred, but did so with my eyes open. My judgment a fair buy on account of perfect way in which it closes our acreage; however, if you, Goebel, and Reveley do not approve, have drafts honored if presented before I arrive and I shall make satisfactory arrangements. Starting home via Kansas City to-morrow.          Deane Gill."

Gill also wired Smith:

"Washington, Pa., June 11, 1925.

*"R. E. Smith, Eureka, Kansas:*

"Purchased lease jointly with Phillips for fifty-five thousand; will see you in a few days; don't start anything on royalty till I get home; have the way open.          Deane Gill."

Within a day or two Gill arrived in Eureka, and plaintiffs signified their readiness to pay $13,750 for their claimed one-fourth interest in the lease. This was declined; conversations between the groups followed; plaintiffs sought without avail to induce Bitler and the Greenland Oil Company to fulfill the alleged agreement made by Gill and Smith in Pennsylvania. Bitler and the oil company declined to be bound by that agreement, and this lawsuit followed.

Plaintiffs' petition alleged their equitable ownership of an undivided one-fourth interest in the lease; narrated the competitive situation immediately prior to the leasing of the property on June 11, 1925; told of Smith's mission to Pennsylvania and his authority to secure the lease or an interest in it on behalf of plaintiffs; alleged

the agency of Deane Gill for defendants to negotiate on behalf of the Greenland Oil Company, and that Gill had full authority to make all contracts on its behalf which he thereafter did make, and that Smith and Gill agreed that plaintiffs would withdraw from the bidding, and—

"That the said Deane Gill as agent for the Greenland Oil Company and as agent for these plaintiffs would endeavor to purchase said oil and gas lease upon said lands in connection with the Phillips Petroleum Company, a one-half interest to go to the Phillips Petroleum Company, a one-fourth interest for the Greenland Oil Company and one-fourth interest for these plaintiffs, and the said Deane Gill and the Greenland Oil Company thereby became and were the agents of these plaintiffs to purchase for them an undivided one-fourth interest in and to said lease."

Plaintiffs further alleged that, relying on this promise of Gill's they "discontinued bidding for and negotiating with the owners of said lands for said lease," and that Gill did buy the lease in behalf of the Phillips Petroleum Company, the Greenland Oil Company, and—

"That the said Greenland Oil Company and Dean Gill took the interest which they had purchased as aforesaid as agents for these plaintiffs, in the name of the Greenland Oil Company without the knowledge or consent of these plaintiffs."

Plaintiffs alleged demand and tender, the repudiation of the Smith-Gill agreement, the subsequent development of producing oil wells on the leased premises, and prayed for an adjudication of their interest in the lease, and for an accounting, a receivership, and other relief.

Defendants' separate answers were verified denials. The evidence was lengthy and sharply controversial in all more or less material respects. Comprehensive findings of fact and conclusions of law were made by the court, to some of which it seems necessary to give space:

"5th. When the showing of oil was had in the well referred to, there was much interest manifested on the part of various oil interests in securing a lease upon the Craft land. On June 6, [1925] . . . plaintiffs directed Smith to secure said lease, or an interest therein, at such sum as in his judgment he should pay for same. Smith left Eureka Saturday, June 6, and arrived at Washington, Pa., Monday morning, June 8, and immediately interviewed Mrs. Craft, and at numerous times thereafter during his stay in Washington. . . .

"6th. The Greenland Oil Company was also interested in the purchase of said lease, and sent Deane Gill to Washington, also to confer with Mrs. Craft, and ascertain the situation with reference to purchasing the lease. At the

time he was not instructed as to what amount he should pay for such lease, or definitely to purchase same until he had conferred with the company. He left Eureka on the night of Sunday, June 7, and got to Washington, Pa., Tuesday morning, the 9th; and . . . called upon Mrs. Craft and interviewed her with reference to the purchase of her lease. She made him no price. . . . Gill also called upon Mrs. Craft at various other times during his stay in Washington.

"7th. Soon after both Smith and Gill were upon the ground, they communicated with each other with reference to the purchase of said lease, and made one or two calls upon Mrs. Craft together. They discussed the proposition of each of them wanting the lease and of the futility of bidding against each other, and the suggestion was made by one or the other of them that it would be advisable for them to join and buy the lease together, and it was agreed that they would confer with their respective interests in Kansas and ascertain if that would be satisfactory.

"8th. Just about the same time that Gill and Smith were discussing the advisability of not bidding against each other, but of joining forces, O. G. Bitler went into the bank at Eureka, of which he was president and L. A. Ladd vice president, and the plaintiffs, Allen, Troxell and Ladd, were there in consultation. Bitler approached the other gentlemen and suggested that Eureka seemed to be pretty well represented in Washington, Pa., and further that it looked foolish for them to bid against each other in the purchase of that lease. He stated that it would seem advisable for them to get together and buy the lease jointly. Some one of the other men replied that that would be fine. Bitler invited them over to the office of the Greenland Oil Co. to discuss the matter further, and they all met there a short time afterwards. At this meeting the question of the amount which should be paid for this lease was discussed, and it was finally agreed that they should bid on the lease and buy it together, up to $40,000. Both Gill and Smith were at once notified of this action.

.      .      .      .      .      .      .      .      .      .      .      .      .

"10th. Subsequent to the receipt of the advice from Eureka as to the purchase of the lease jointly, Mrs. Craft suggested to both Gill and Smith that she had concluded to receive sealed bids for the lease. They both objected to this, and suggested the advisability of selling it on public bids, since thereby they would not be precluded by one bid. She finally concluded to do this, and notified them that the lease would be sold at public auction in her lawyer's office on Thursday, June 11.

"11th. Wednesday morning, June 10, a Mr. Sherman, representing the Phillips Petroleum Company, called upon Mrs. Craft while Smith and Gill were there. They excused themselves and went to the hotel. Gill was acquainted with Sherman and knew whom he represented. On the return to the hotel, there was some suggestion made by Gill to the effect that the presence of Sherman might simplify matters. Sherman had said to Gill, as he left the Craft home, that he wanted to see him later. After this, Sherman had an interview with Gill and suggested that the Phillips Petroleum Co. and the Greenland Oil Co. go together and buy the lease. Gill stated that he would

have to confer with his people in Kansas before agreeing to do this, and Sherman made a statement to the same effect. They immediately did communicate with their respective companies and advised each other that they would join in the purchase of the lease.

"12th. Thereafter Gill and Smith agreed that he, Gill, should join with Sherman in the purchase of said lease, and that the half interest secured by Gill, or the Greenland Oil Co., would be divided between their respective people. They discussed the amount that the lease would probably go to in the bidding, and each expressed the belief that it would go above $50,000, but not very much above that amount, and Smith stated to Gill that his people would stay in as long as he, Gill, and Sherman thought it advisable to bid. In this interview Gill stated to Smith that he had been authorized to bid only to $50,000 in connection with the Phillips Petroleum Co. and that if he had to pay more than that, he would take the half interest himself, if his company did not want it, but that he would divide the same with the Smith people. Thereupon, Smith stated to Gill that inasmuch as Gill would look after the bidding, there was no use for him, Smith, to stay there longer, which was assented to by Gill, and thereupon Smith left Washington and came home to Eureka, arriving Friday, June 12.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"15th. While in Washington, Pa., Smith had suggested to Gill the advisability to trying to purchase some of the royalty, and Gill advised against this at that time, and suggested that it would be better for them to first buy the lease, before saying anything about the royalty.

"16th. Gill left Washington on his return trip about noon on Friday, the 12th. He stopped in Kansas City to see Bitler, but said nothing to Bitler about any arrangement that he had made with Smith with reference to the purchase of the lease. At that interview, the question of having bid more than he was authorized to bid was discussed, but Bitler advised Gill that the company would take the lease.

"17th. Although Gill did not personally inform Bitler, in the interview in Kansas City, Saturday night on his return from Washington, Pa., that he had made an arrangement with Smith to divide the lease with him (Smith) and his people, yet Bitler, as president of the Greenland Oil Company, and said company, had notice of this by reason of the knowledge of their agent, Gill, who was also a director of said company and held other offices therein. Bitler had actual notice of the claims of the plaintiffs very shortly thereafter and long before the lease was actually paid for.

"Conclusions of Law.

"1st. When the Greenland Oil Company elected to take the lease at the price paid therefor by Gill, $55,000, it did so subject to the rights of the plaintiffs therein; and if the pleading of the plaintiffs is not sufficient to support this result, as based upon the evidence, the same should be, and is considered, amended to conform to such evidence.

"2d. The plaintiffs are entitled to recover, as against the defendants, the Greenland Oil Company and Deane Gill, a one-fourth interest in said lease.

"3d. The plaintiffs are indebted to the Greenland Oil Company and Deane Gill, the sum of $13,750."

Judgment was entered accordingly. Defendants appeal, assigning various errors, and to one of the gravest of these we will first give attention.

The record and findings of the trial court make it clear that Gill had no authority from his principal to make the agreement to buy a one-fourth interest in the lease in behalf of plaintiffs nor to bind his principal to any such contract. Plaintiffs' own evidence and the trial court's findings show that so far as the contract of the principals was concerned it began and ended in the $40,000 agreement. Neither group of principals bound themselves to bid and buy together at any figure in excess of $40,000. The evidence and findings also show that Smith knew that Gill did not have authority to buy at any terms except in pursuance of instructions from his principal. Gill did not have authority to buy jointly with Sherman until he consulted his principal and obtained permission to do so.

From the fact that Troxall repeatedly telephoned and telegraphed instructions to Smith, it would also seem that Smith himself did not have authority to agree to buy in connection with Gill except as later directed in Troxall's telegram; and the trial court's finding No. 7 is fairly indicative of that conclusion, for if Smith had such authority it was not necessary for him to agree "that they [himself and Gill] would confer with their respective interests in Kansas and ascertain if that would be satisfactory." However, the trial court also found, No. 5, that Smith had ample authority to make any sort of bargain to secure the lease "or an interest therein." Perhaps this seeming inconsistency between the broad powers of Smith, finding 5, and Smith's agreement to ascertain if it would be satisfactory to his principals for him to buy in connection with Gill, finding 7, may be more superficial than real.

Summarizing the trial court's findings as to Gill's powers:

(a) He was authorized to bid and buy in coöperation with Smith up to $40,000;

(b) He was authorized to bid and buy on behalf of his principal up to $50,000;

(c) He was authorized to bid and buy in coöperation with Sherman, but not at any figure in excess of $50,000.

Gill did buy in conjunction with Sherman, which was within his

authority; but he exceeded his authority as to the sum which he paid. Now the pertinent law of such a situation is this: When an agent exceeds his authority, his principal ordinarily has two courses open to him—he may ratify the contract of his agent and will be bound thereby precisely as if he had granted in advance the authority which his agent assumed to exercise; or the principal may disavow the unauthorized act of his agent, and thus, speaking generally, relieve himself of the obligation to which his agent presumed to bind him.

In this case, upon receipt of Gill's telegram reporting the purchase of the lease but that he had exceeded his authority as to the price, the Greenland Oil Company readily acquiesced in Gill's unauthorized purchase of the lease at $55,000. That attitude constituted ratification of the leasing contract between the lessor, Mrs. Craft, and the Greenland Oil Company and the Phillips Petroleum Company. But quite as promptly the Greenland Oil Company declined to give assent to the unauthorized agreement of Gill that Smith's principals should have a quarter interest in this lease. How then can the doctrine of ratification be applied to the Smith-Gill agreement? Gill never pretended to Smith that he had authority to make such an agreement. Indeed, Smith knew quite well Gill had no such authority. Even in the last conversation had by Smith and Gill before Smith left for home, Gill was unable to give Smith assurance that his principal would assent to such arrangement. Moreover, in making the agreement with Gill in excess of Gill's powers, Smith knew Gill was departing from his duty to keep within the limitations of his authority, and knew that such agreement would not be binding on the Greenland Oil Company unless the latter should ratify it. And not only did the Greenland Oil Company decline to ratify this unauthorized agreement, but promptly repudiated it.

An agreement so made is not one which addresses itself with appealing force to a court of equity. The position of plaintiffs reduces to this: In effect they say, "We made an agreement with defendant to bid for and buy these leases on joint account at $40,000, and to instruct our agents to that effect. But while that agreement was fruitless, our agent agreed with defendant's agent that the latter should disregard the limitations of his authority and bid for and buy the lease on our joint account; and defendant's agent did so purchase it; and now, notwithstanding defendant's prompt dis-

avowal and repudiation of that agreement, we demand its specific enforcement." What sort of syllabus could we write to a decision giving sanction to such a judgment? Would it be proper to declare that if A makes an agreement with the agent of B which A knows the agent has no power to make, by which A is to receive an interest in an oil and gas lease which the agent is employed by B to obtain from a third person C, and if the agent obtains such a lease and B retains it, A can maintain an action against B to compel a conveyance of the interest promised him by B's agent? Such a rule would be restating the law of agency with a vengeance.

This court is unable to give its assent to such a doctrine. The ratification of Gill's purchase of the lease from Mrs. Craft at $55,000 did not carry with it a ratification of Gill's promise to Smith that plaintiffs should have a quarter interest in that lease.

Plaintiffs argue that by the Smith-Gill agreement Gill became their agent to purchase the lease. He could not do so without his principal's consent, and Smith was at all times aware that no such consent had been given. The fact that Gill was secretary, treasurer, and director of the defendant corporation gave no added scope to his power to bargain on behalf of his principal.

Accepting the trial court's findings of fact at their full significance, this court is constrained to hold that since the Greenland Oil Company did not authorize the Smith-Gill agreement, it had a right to repudiate it and did so promptly, consequently it is not bound by that agreement and cannot be compelled to execute it. Touching the adjudged personal liability of Bitler and Gill, it is clear that whatever part was taken by Bitler in the transaction was in behalf of his corporation, and not otherwise. As to Gill, no cause of action was pleaded or proved against him; no theory of Gill's individual responsibility for the alleged Smith-Gill agreement was before the trial court for consideration; nor was judgment entered against Bitler and Gill because of some personal delinquency of theirs which brought about the defendant corporation's failure to ratify. From this conclusion this court sees no escape; and therefore the other questions urged upon our attention need not be determined.

The judgment is reversed with instructions to enter judgment for defendants.